# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**MONICA L. DAMRON,**

    **Plaintiff,**

  v.                                          Civil Action 2:17-cv-044
                                                 Judge Michael H. Watson
                                                 Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Monica L. Damron, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying both her Title II Disability Insurance Benefits and Title XVI Supplemental Security Income Disability applications. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

I. **BACKGROUND**

    A. **Prior Proceedings**

Plaintiff filed her first applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on April 10, 2006, alleging disability since March 20, 2006. (*See* Doc. 10-3, Tr. 94, PAGEID #: 145). Her applications were denied initially, after reconsideration, and by an Administrative Law Judge on December 17, 2007. (*Id.*).

Plaintiff filed another application for DIB and SSI on June 21, 2010, this time alleging a disability onset date of December 18, 2007. (*Id.*, Tr. 112, PAGEID #: 163). Her claims were denied initially on November 9, 2010 (*Id.*, Tr. 122, PAGEID #: 173), and upon reconsideration on March 25, 2011 (*id.*, Tr. 148, PAGEID #: 199). Administrative Law Judge Paul E. Yerian

(the "ALJ") held a hearing on May 17, 2012 (Doc. 10-2, Tr. 35, PAGEID #: 85), after which he entered a partially favorable decision on November 13, 2012, finding Plaintiff was disabled beginning on September 4, 2012, but not before (*id.*, Tr. 10, PAGEID #: 60). Plaintiff sought review of the unfavorable portion of the ALJ's decision, but the decision became final when the Appeals Council denied review on January 28, 2014. (*Id.*, Tr. 4, PAGEID #: 54). However, by order dated February 10, 2015, this Court remanded the claims for further consideration of the potential retroactivity of consultative optometrist Sarah Yoest's opinion. (Doc. 10-9, Tr. 724, PAGEID #: 782).

Accordingly, a second administrative hearing was held on September 14, 2015 before ALJ Yerian, this time with respect to only the issue of disability for the period prior to September 4, 2012. (Doc. 10-8, Tr. 700, PAGEID #: 757). The ALJ issued a written decision on November 12, 2015, once again concluding that Plaintiff was not disabled prior to September 4, 2012. (*Id.*, Tr. 675, PAGEID #: 732). Plaintiff again requested review of the administrative decision to the Appeals Council, which denied her request on November 16, 2016. (*Id.*, Tr. 666, PAGEID #: 723).

Plaintiff filed this case on January 17, 2017 (Doc. 3), and the Commissioner filed the administrative record on March 24, 2017 (Doc. 10). Plaintiff filed a Statement of Specific Errors on June 20, 2017 (Doc. 16), the Commissioner responded on August 4, 2017, (Doc. 17), and no Reply was filed.

### B. Relevant Testimony at the Administrative Hearings

#### *1. May 17, 2012 Hearing*

Plaintiff's counsel began the hearing by explaining that Plaintiff has virtually no sight out

of her right eye and stated that "[s]he has been told that her left eye is now weakening greatly." (Doc. 10-2, Tr. 41, PAGEID #: 91). During Plaintiff's testimony, she reiterated that she had no eyesight with her right eye and could see "just motion." (*Id.*, Tr. 69, PAGEID #: 119). Plaintiff explained that with her left eye she can see people and big objects, she watches movies and DVDs, but she can't read because the words are too small. (*Id.*). Finally, Plaintiff stated that she can bathe and dress on her own, and she sometimes can do laundry, clean, and cook. (*Id.*, Tr. 72, 75, PAGEID #: 122, 125).

Dr. Richard Simmons, a board-certified ophthalmologist, also testified as a medical expert via telephone. (Doc. 10-2, Tr. 42, PAGEID #: 92). Although Dr. Simmons never personally examined Plaintiff, he reviewed her medical records prior to the hearing. (*Id.*). As to Plaintiff's right eye, Dr. Simmons opined multiple times that "there's no question the right eye's bad." (*Id.*, Tr. 44, PAGEID #: 94; *see also id.* ("it's no question that she is surgically impaired in the right eye")). Dr. Simmons testified that vision in the left eye, however, "is usually 20/30" and that the visual acuity in the left eye was not -22 or worse. (*Id.*). Ultimately, Dr. Simmons explained that he did not believe Plaintiff met or equaled the listings as a result of her vision issues, because the listings require that the best eye be considered—in this case Plaintiff's left eye—and it did not meet the listing requirements. (*Id.*, Tr. 45, PAGEID #: 95).

In terms of limitations, Dr. Simmons noted that Plaintiff would not have any depth perception due to her right-eye vision loss, which would make driving a car difficult. (*Id.*). He further testified that if work place hazards or dangerous machinery were directly in front of Plaintiff, she would be able to avoid them, but if they were off to the side, she would not. (*Id.*, Tr. 46, PAGEID #: 93). Finally, Dr. Simmons opined that Plaintiff "ought to be able to read up

3

close with a proper optical correction," she had no contraindications to using a computer screen, and she would have no problems in determining shape or colors of objects, such as screws, nuts, or bolts. (*Id.*, Tr. 47, PAGEID #: 93).

### 2. September 14, 2015 Hearing

In an opening statement, Plaintiff's counsel stated that the key issue before the ALJ was the possible retroactivity of Dr. Yoest's September 2012 report. (Doc. 10-8, Tr. 704, PAGEID #: 761). During Plaintiff's testimony, she explained that she needs help with everything, including cooking, cleaning, and laundry, because she can't read the ingredients, measure, or differentiate colors. (*Id.*, Tr. 708–09, PAGEID #: 765–66). Plaintiff also stated that she does not watch TV very often because "it's blurry" and does not spend any time on the computer or read. (*Id.*, Tr. 709, PAGEID #: 766).

### C. Relevant Medical Background

On January 3, 2006, Plaintiff saw Dr. Karl S. Pappa, M.D., due to elevated pressure in her right eye. (Doc. 10-13, Tr. 771, PAGEID #: 833). At that time, Plaintiff was diagnosed with "very advanced, chronic angle closure glaucoma in the right eye with a visual field test showing only about a 10% remaining field of vision with a central tunnel in the right eye." (*Id.*). On April 13, 2006, Dr. Lisa Borkowski performed a pars plana vitrectomy in Plaintiff's right eye to treat aqueous misdirection. (Doc. 10-7, Tr. 578–79, PAGEID #: 634–35). Although Plaintiff initially had no postoperative complications, Plaintiff's eye became inflamed and it was determined that Plaintiff would undergo a repeat virectomy, this time requiring complete removal of the anterior vitreous. (*Id.*). Plaintiff underwent the second virectomy on December 7, 2006. (*Id.*, Tr. 580, PAGEID #: 636).

4

Plaintiff continued to see Dr. Pappa following her surgeries. At one such appointment on February 5, 2010, Dr. Pappa opined that Plaintiff's "visual impairment affects her depth perception, affecting her ability to feel safe driving and performing some work related activities." (Doc. 10-7, Tr. 418, PAGEID #: 474). At another appointment on January 25, 2011, Dr. Pappa again noted Plaintiff's poor depth perception and opined that she was "unable to work at heights" and "unable to drive." (*Id.*, Tr. 453, PAGEID #: 509). An examination on that date revealed right eye vision of 20/400 and left eye vision of 20/30 +1. (*Id.*, Tr. 521, PAGEID #: 577). On August 2, 2011, another evaluation by Dr. Pappa revealed 20/400 vision out of Plaintiff's right eye, and 20/30 +2 vision out of the left eye. (*Id.*, Tr. 519, PAGEID #: 575). Later that month, on August 26, 2011, Dr. Pappa completed a Visual Impairment Questionnaire in which he stated Plaintiff was legally blind in her right eye. (*Id.*, Tr. 516, PAGEID #: 572). Finally, a December 6, 2011 exam revealed 20/25+ vision for Plaintiff's left eye. (*Id.*, Tr. 642, PAGEID #: 698).

Plaintiff saw Dr. Sarah Yoest, O.D., for an Optometric Consultative Examination on September 4, 2012. (*Id.*, Tr. 648, PAGEID #: 704). Dr. Yoest opined that the ocular pathology primarily responsible for Plaintiff's left-eye impaired vision was glaucoma, and her right-eye impairment was a result of glaucoma and pigmentary deposits on the cornea. (*Id.*, Tr. 649, PAGEID #: 705). Upon examination, Dr. Yoest stated that Plaintiff's visual acuity for distance and reading, with best correction, was 20/40 in her left eye. (*Id.*, Tr. 648, PAGEID #: 704). However, Dr. Yoest noted that Plaintiff's acuity was "misleading," as her "visual function [was] much worse than acuity would indicate." (*Id.*, Tr. 649, PAGEID #: 705). Ultimately, Dr. Yoest found that Plaintiff was unable to avoid ordinary hazards in the workplace, read very small print,

5

read ordinary newspaper or book print, determine differences in shape and color of small objects, or view a computer screen due to photophobia. (*Id.*, Tr. 661, PAGEID #: 717).

In a "Homemaker and Low Vision Evaluation" dated October 16, 2012, rehabilitation teacher Kathy Moos, noted that Plaintiff's distance acuities tested at 10/350 in her right eye and 10/25 in her left eye on a Feinbloom test chart. (Doc. 10-13, Tr. 766, PAGEID #: 828). Confrontation revealed "a severe restriction in all quadrants of visual field in the right eye and moderate loss of field in all quadrants in the left eye." (*Id.*). Further, it was noted that "[a]lthough her near acuity was good at the time of the assessment, she would not function as well with lower levels of illumination." (*Id.*). The report ultimately concluded that Plaintiff had functional limitations in the areas of low vision, budgeting, money management, communications, shopping, meal preparation, laundry, cleaning, home mechanics, personal management, healthcare management, child care, leisure time activities, and mobility. (Doc. 10-13, Tr. 769, PAGEID #: 831).

In a September 9, 2015 letter, Dr. Pappa opined that Plaintiff's right eye "has been a legally blind eye since December 7, 2006. The left eye nerve has been healthy and she has had good vision in that eye." (Doc. 10-13, Tr. 771, PAGEID #: 833). In that same letter, Dr. Pappa noted that "Dr. Yoest's examination measured the left eye at 20/40 in March 2012 and we measured 20/30 with a healthy looking nerve, although she did have some visual field loss which we could not explain at the time." (*Id.*). Ultimately, Dr. Pappa noted that his "findings do corroborate with Dr. Yoest's examination of September 2012 indicating that [Plaintiff's] visual limitations were severe 6 years prior and did not just happen in September of 2012." (*Id.*).

6

**D. State Agency Consultants**

On July 7 2009, DDD physician Esberdado Villanueva, M.D., reviewed the record and adopted the residual functional capacity ("RFC") from the December 2007 ALJ decision.[1] (*Id.*, Tr. 631, PAGEID #: 687).

On November 4, 2010, DDD physician Willa Caldwell, M.D., reviewed the record and concluded that Plaintiff had no exertional, postural, or manipulative limitations, but had limited depth perception and field of vision, and ultimately needed to avoid all hazards, such as machinery, heights, and driving commercial vehicles. (Doc. 10-3, Tr. 117–18, PAGEID #: 168–69). On March 17, 2011, upon reconsideration, DDD physician W. Jerry McCloud, M.D. reviewed the updated record and agreed that Plaintiff had limited depth perception and field of vision, but adopted the RFC from the December 2007 ALJ decision. (*Id.*, Tr. 143–44, PAGEID #: 194–95).

**E. The ALJ's Decisions**

The ALJ found that prior to September 4, 2012, Plaintiff had suffered the following severe impairments: status post surgeries, right eye with vision reduced to hand motion, chronic open angle glaucoma in both eyes, and best correct vision in the left eye of 20/30; obesity, and affective and anxiety-related disorders. (Doc. 10-8, Tr. 678, PAGEID #: 735). Even with these impairments, the ALJ held that prior to September 4, 2012, Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (*Id.*, Tr. 679–680, PAGEID #: 736–737). Specifically, the ALJ noted that although Plaintiff "has been legally blind

---

[1] The RFC from the ALJ's December 17, 2007 Decision was as follows: "I find that the claimant has the residual functional capacity to perform light work except for work that requires full depth perception and full peripheral vision. Accordingly, claimant cannot work around hazardous heights and machinery or perform commercial driving." (Doc. 10-3, Tr. 99, PAGEID #: 150).

out of her right eye, her best-corrected vision out of her left eye . . . has not approached the requirement of visual acuity of 20/200 or less." (*Id.*, Tr. 680, PAGEID #: 737). Further, the ALJ explained that Plaintiff did not have "a documented contraction of peripheral visual fields or loss of visual efficiency as described in Sections 2.03 or 2.04, or total bilateral ophthalmoplegia as required by Section 2.06." (*Id.*).

As to Plaintiff's RFC prior to September 4, 2012, the ALJ stated:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she could not climb ladders, ropes, or scaffolds and needed to avoid hazards, such as unprotected heights, dangerous machinery, and commercial driving. She could frequently be exposed to extremes of temperature, humidity, and wetness. She could frequently handle and finger objects. She could perform simple repetitive tasks and some moderately complex tasks not involving more than occasional changes in work duties and processes, and not involving a fast assembly line pace or strict production quotas, though she could meet end of day goals. She could engage in occasional contact with others.

(*Id.*, Tr. 682, PAGEID #: 739).

In making this determination, the ALJ emphasized that the medical records document that "Plaintiff continued to have blindness out of her right eye with relatively stable visual acuity out of her left eye." (*Id.*, Tr. 684, Tr. 741). Accordingly, the ALJ assigned great weight to the assessments of Dr. Villanueva and Dr. McCloud. (*Id.*). The ALJ gave "less weight" to the less restrictive assessment of Dr. Caldwell, in part because "she did not address the December 2007 decision." (*Id.*).

Turning to Dr. Pappa, the ALJ concurred with his opinion that Plaintiff has had severe visual loss since 2006, and would need to avoid hazards, such as working at unprotected heights and driving, due to her loss of depth perception. (*Id.*, Tr. 685, PAGEID #: 742). However, the ALJ emphasized that he did not accept Dr. Pappa's assessment to the extent that it could be

8

construed as more restrictive than the opined RFC, because Dr. Pappa's own summaries acknowledge "a relatively healthy left eye with fair vision." (*Id.*).

Further, the ALJ noted Dr. Simmons credentials, and the fact that he had access to a significant portion of the record, which was applicable to the period prior to September 4, 2012. (*Id.*, Tr. 686, PAGEID #: 743). Overall, the ALJ stated Dr. Simmons' opinion "was generally consistent with and supported by the record as a whole, including the objective clinical and laboratory findings referenced in this decision." (*Id.*). Moreover, the ALJ noted that the distinction between Dr. Simmons, an ophthalmologist, and an optometrist like Dr. Yoest are noteworthy, particularly in terms of training and specialization. (*Id.*, Tr. 687, PAGEIED #: 744).

As to Dr. Yoest, the ALJ found that the documentation prior to her evaluation, as well as the evaluation itself, failed to support "a conclusion that the limitations she suggested on the September 4, 2012 date of the examination were present prior to that date, except that [the ALJ] concur[red] that [Plaintiff] needed to avoid hazards[.]" (*Id.*, Tr. 686, PAGEID #: 743). More specifically, the ALJ held that Dr. Yoest's analysis was not consistent with the contemporaneous medical/visual evidence, including the reports from Dr. Pappa and the state agency sources. (*Id.*, Tr. 687, PAGEID #: 744). Consequently, the ALJ assigned little weight to Dr. Yoest's assessment prior to September 4, 2012, to the extent it could be construed as more restrictive than the opined RFC. (*Id.*, Tr. 687, PAGEID #: 744).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g).

"[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

### III. DISCUSSION

In her Statement of Specific Errors, Plaintiff alleges that the ALJ erred in analyzing the retroactivity of Dr. Yoest's Consultative Examination Report. (Doc. 16 at 7). More specifically, Plaintiff argues that the reasoning provided by the ALJ for not affording any retroactivity to Dr. Yoest is not supported by substantial evidence. (*Id.* at 7–8).

As Plaintiff acknowledges, the ALJ gave at least two reasons for not affording any weight to Dr. Yoest's opinion prior to September 4, 2012: (1) the ALJ did not find that the documentation prior to Dr. Yoest's examination supported a conclusion that the opined limitations were present prior to September 4, 2012, especially in light of other contemporaneous evidence, and (2) the ALJ placed more emphasis on Dr. Simmons' opinion, an ophthalmologist, regarding Plaintiff's pre-September 4, 2012 limitations, which he held was generally consistent with and supported by the record as a whole. (Doc. 10-8, Tr. 686–87, PAGEID #: 743–44).

Turning to the first rationale, the ALJ assigned little weight to Dr. Yoest's opinion regarding restrictions prior to September 4, 2012. As an initial matter, Plaintiff attempts to argue

that this is inconsistent with the ALJ's November 13, 2012 decision, in which he found Plaintiff was disabled on September 4, 2012, after assigning Dr. Yoest's opinion "great weight." The Court finds no such inconsistency. In his most recent decision, the ALJ was solely addressing the retroactivity of Dr. Yoest's opinion, as his previous decision regarding Plaintiff's post-September 4, 2012 disability status was final. Thus, it is clear that the ALJ assigned great weight to Dr. Yoest's September 4, 2012 opinion, and used it as the basis of finding Plaintiff disabled beginning on that date. This is not inconsistent with the ALJ also finding that the same opinion should be granted little weight in determining Plaintiff's disability prior to the evaluation date.

Plaintiff next argues that even if the opinions are not inconsistent, the ALJ "failed to evaluate the most important part of Dr. Yoest's opinion"—that Dr. Yoest believed the visual acuity testing in the claim file was misleading and worse than the acuity measurements indicated. (Doc. 16 at 9–10). Despite this contention, the visual acuity was discussed at length by the ALJ. Indeed, the ALJ discussed three different evaluations that demonstrated left eye vision of 20/30 +1, 20/30 +2, and 20/25+. (Doc. 10-8, Tr. 684, PAGEID #: 741). Further, the ALJ acknowledged that although Dr. Yoest reported Plaintiff's left eye was 20/40, she believed Plaintiff's visual function was much worse than the acuity would indicate. (*Id.*, Tr. 686, PAGEID #: 743).

However, prior to Dr. Yoest's evaluation, no other medical record suggests that Plaintiff's visual acuity was misleading. Instead, Plaintiff relies on the fact that Dr. Yoest reviewed visual acuity testing that was done prior to September 4, 2012, in order to reach her conclusion. As Plaintiff notes, however, "Dr. Simmons' testimony was also reliant, to a large degree, on the visual acuity testing in the file." (Doc. 16 at 9). With two medical sources relying

11

on the same evidence and reaching different conclusions, it was the ALJ's job is to resolve the inconsistency. *See, e.g.*, *Goodson v. Chater*, 89 F.3d 833 (6th Cir. 1996) ("It is the Commissioner's function to resolve conflicts in the medical evidence.") (citing *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984)). That the ALJ resolved the inconsistency in a manner that Plaintiff disagreed with does not mean the ALJ "ignored" evidence, or that his ultimate conclusion was not supported by substantial evidence.

To the contrary, the ALJ resolved the inconsistency by relying on Dr. Simmons' opinion prior to September 4, 2012, and explained, rather extensively, his decision to do so:

> I note that Dr. Yoest is an optometrist, as opposed to an ophthalmologist, and the distinction in terms of training and specialization is noteworthy, particularly when discussing the possibility of functional limitations three years prior to the date of that examination. Even though [Dr. Simmons] was a non-examining source, he had access to contemporaneous records in both 2007 and 2012. As a Board-certified physician, specializing in Ophthalmology, he was clearly more qualified than the licensed optometrist. The optometrist's analysis is not consistent with the contemporaneous medical/visual evidence . . . , including those from the state agency sources or the Board Certified medical expert [Dr. Pappa] in 2007 or in 2012.

(Doc. 10-8, Tr. 687, PAGEID #: 744). Further, the ALJ explained Dr. Simmons' opinion "was generally consistent with and supported by the record as a whole, including the objective clinical and laboratory findings." (Doc. 10-8, Tr. 686, PAGEID #: 743).

Plaintiff argues again that this is inconsistent with the ALJ having granted "great weight: to both Dr. Simmons and Dr. Yoest in his previous opinion. (Doc. 16 at 10). Plaintiff also alleges that the ALJ failed to explain why Dr. Simmons' opinion was favored prior to September 4, 2012, and Dr. Yoest's opinion was favored after September 4. (*Id.*). This alleged omission, according to Plaintiff, leads to the conclusion that the ALJ's decision does not rely on substantial evidence. (*Id.*). Once again, the Court disagrees.

12

The ALJ made it clear that he relied on Dr. Simmons' opinion prior to September 4, 2012, because it was consistent with every other visual acuity test that was performed before Dr. Yoest's opinion, including the opinions of Dr. Pappa and the State agency consultants. The medical evidence overwhelmingly showed that although Plaintiff's right eye impairments were severe, her left eye had not approached the requirement of visual acuity of 20/200 or less. Dr. Yoest's opinion, on the other hand, never stated that her conclusions applied retroactively, and the ALJ chose not to afford it little weight prior to September 4, 2012 based on its inconsistency with the remainder of the record. This choice was well within the ALJ's discretion. *See Lowry v. Astrue*, No. CIV. A. 2:07-CV-1004, 2009 WL 498029, at *2 (S.D. Ohio Feb. 24, 2009) ("In close cases, the Commissioner's decision must be affirmed so long as there is substantial evidence supporting the Commissioner's fact determinations 'because there is a zone of choice within which the Commissioner can act, without fear of court interference.'") (quoting *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986)).

Consequently, because it is the ALJ's duty to resolve conflicts in the medical evidence, and the ALJ appropriately explained his decision by relying on other medical examinations, the Court finds the ALJ's decision was supported by substantial evidence. *See Arrington v. Comm'r of Soc. Sec.*, No. 12-10079, 2012 WL 5379457, at *1 (E.D. Mich. Oct. 31, 2012) ("The decision of the Commissioner must be upheld if supported by substantial evidence, even if the record might support a contrary decision") (citing *Smith v. Secretary of HHS*, 893 F.2d 106, 108 (6th Cir. 1984); *Mullen*, 800 F.2d at 545).

IV. **CONCLUSION**

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc.

16) be **OVERRULED** and that judgment be entered in favor of Defendant.

## Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: October 27, 2017 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE